May it please the court? Is that better? Good. Yes, thank you. Chris McCracken for Appellant Columbia Export Terminal, CET. I'd like to reserve three minutes of my time for rebuttal. The district court erred in dismissing CET's claim for RICO violations for three reasons. First, the district court applied the incorrect standard for resolving potential conflicts between two federal statutes. Second, the district court erred under the two-part test it did apply because CET's RICO claim arises independent of the collective bargaining agreement and does not require... I would like to begin there. I want to cut right to the chase. Your allegation is that timesheets of these individual defendants were fraudulent. That is the basis of your claim as I understand it. But they are fraudulent only if the collective bargaining agreements that the locals signed that governed these individual defendants do not authorize the payments. And opposing counsel says, but the CBA's do authorize those payments. So it seems to me that the entire case is about the meaning of the collective bargaining agreements. And I'd like your response to that, please. CET complains of two basic violations. The first is a split shift where one union member works the first half of a shift and the second union member works the second half of a shift, yet they both submit timesheets for a full shift. The second complaint is the no-show complaint where a union member does not show up at the job at all, yet submits a timesheet for a full shift. Counsel, counsel, counsel, at least as to the second item, there are several circumstances under these collective bargaining agreements that are claimed to support the payments. Again, why isn't this whole case about interpreting the collective bargaining agreements and whether they do or do not, and I'm not suggesting they do or they do not, but the they don't. The defendants have failed to point to any particular provision that they believe authorizes the two claimed violations. Nothing in the agreement allows a member to submit time cards for full shift. There's four hour, excuse me, there's four hour minimums, there's dead time provisions. You're arguing the merits. I don't want to hear about the merits. What I'm saying is I don't see how you can divorce your substantive claim from an interpretation of these agreements. What we haven't heard from the defendants is that a particular provision in this agreement authorizes the specific violations of the agreement or alleged in the complaint. There are a couple provisions that they throw out there, such as section 4.1 of the guarantee of eight hours work to employees when ordered and turned to work, but they do not explain how that possibly justifies the acts complained of. Well, it might. It might depending on the facts and that is a typical situation in which facts have to be laid side by side with the provisions of a collective bargaining agreement to determine who's right and who's wrong. You may be right, you may be wrong, but we don't know the answer to that without the agreements. Could you help me understand the relationship between your claims, which as I understood them, were that the employees were submitting fraudulent timesheets and the union's response, which is it doesn't matter if they were fraudulent or not because you weren't damaged. There was no overpayment. Is the overpayment issue an element of your claim? Yes, it is. I mean, we believe we overpaid these individuals. That's the basis of our claim. I'm not sure I'm completely following your question, Judge Akuda. In order to prevail in court, you have to show not just that fraudulent timesheets were submitted, but that if the timesheets have been accurate, you would have overpaid. Is that your understanding of your claim? You would have to show both that the timesheets were fraudulent and also if the No, if I'm understanding your question correctly, the timesheets were fraudulent. We paid based in reliance on those timesheets. Because those timesheets overstated the amount of hours worked, we overpaid. Opposing counsel says regardless of what the timesheets said, whether they're accurate or inaccurate, you did not overpay. Therefore, you don't have a claim. As Judge Graber said, in order to determine if you have a winning claim, we have to inspect what the CBA allows. Do you agree with that? As long as you didn't overpay, if they can prove by means of the provisions in the CBA that you didn't overpay, you don't have a claim here. I'm sorry, I'm failing to track your question a little bit. May I put it a different way? If you didn't overpay any of these individuals, then you have shown zero damages. Am I correct about that? If you cannot show that you overpaid, you have no damages. I think that's axiomatic. Okay, and damages are an element of your claim, are they not? Yes. In order to determine if you suffered damages, the union would have to have an opportunity and the individual defendants would have to have an opportunity to show that they were not overpaid by pointing to their situation side by side with the collective bargaining agreements. That's where we disagree because the provisions in the collective bargaining agreement are not ambiguous. But that goes to the merits of who's right and who's wrong about damages and overpayment. Once you get into the weeds in the collective bargaining agreements, they say we were not overpaid because there are provisions that authorize the payments that were made to us in the situations we were in. We don't know whether that's right or wrong, but the only way we would know is to have someone explain how they worked, when they worked, and what the collective bargaining agreement permitted by way of payment for that work. But they do not point to a specific provision in the agreement that says this provision authorizes us to no show for work and claim eight hours. Nor do they point to a specific provision that says this allows us to do the split shift where one person works a half shift, another works the other half, and claims the full benefit of two full shifts. Well, I guess the claim requires the application of the CDA. Why shouldn't it be arbitrated? Why wouldn't it go through the dispute resolution process laid out in the CDA? Well, there's several reasons why the arbitration provisions do not apply. They don't cover disputes between the defendants in this case. It applies, the arbitration provision definition of grievance applies only to disputes with the local union who is not a defendant. Let me stop you there because at least the findings and recommendations make specific reference to a provision which makes it pretty clear to me at least, it seems to syndicate that individual workers are covered as well. It's not limited simply to you. And which provision is that? I'm sorry. Well, let's see here. It says a mechanism for employers to file complaints against, quote, any member of the grain section, close quote, describes the process to be brought before grievance committee. That's discussed on page 17 of the findings and recommendations. And as a corollary to Judge Clifton's question, as you've answered it, you have sued the individual workers, not just the international. And those individual workers are bound by the local collective bargaining agreement. So by suing them individually, you have pulled in what gives them a right to payment, which is the local CBAs. The definition of grievance which drives the grievance arbitration provisions in this case is limited in its scope to claims between the employer, CET, and the local union. Throughout section 16 of the collective bargaining agreement, which sets forth the terms of the arbitration provisions and the graduated steps towards possible arbitration appeal, the word grievance is used to capture the scope and universe of those claims that can be grieved and arbitrated. The agreement is careful in choosing the words it does to describe the with respect to the scope of arbitrable claims or disputes. It's limited to those that involve the international local union, which cannot reasonably be interpreted to include the international. It's the local unions and makes no mention of the members. Well, I just cited something from the findings and recommendations that talk about the members, and I didn't hear a response. It sounds like a classic labor dispute. And for some reason, the employer is desperately trying to avoid the resolution procedures set out in the agreement, and I can't figure out why. But here we are. Council, did you wish to reserve rebuttal time? You're down to about two and a half minutes. Thank you, Your Honor. I would like to reserve rebuttal. And we will hear from Mr. Dalmat. I hope I pronounced your name right. You did, and good morning, Your Honors, and may it please the court. Darren Dalmat on behalf of the International Longshore Workers Union. In this lawsuit, CET accuses 154 of its own... Could you get closer to your microphone? We're having trouble hearing you. I'm sorry. Is this better? Yes, thank you. CET accuses 154 of its own employees and their union, the ILWU, of racketeering by fraudulently claiming inflated wages via interstate mails and wires. Adopting Magistrate Russo's sound opinion, Judge Simon correctly dismissed those claims because Section 301 of the Labor Management Relations Act required the underlying contractual dispute to be arbitrated before the case could proceed in court, and I'd like to pick up... Could I start with the claim that the arbitration agreement by its terms doesn't refer to the international union as being required to grieve. It also doesn't directly include the employees, though there are other provisions potentially that do. Can you address that issue first? Absolutely, Judge Akuta. Section 1.1 of the collective bargaining agreement makes the scope of the agreement one between ILWU and several locals on behalf of themselves and each of their grain on the other. And so, yes, the locals are within the grievance procedure under 16.4, but they are the party on behalf of the members, and it is the members that are sued, it's the members whose wages are at issue, so they... It is, of course, the members who, if they had an underpayment claim, they would be initiating the grievance procedure through their union. And so, in this case, we have the reverse situation where the union, and both unions are signatories, by the way, the international... So the grievance, the definition of grievance, does not refer directly to the international. So how do we get the international into that grievance provision, the definition of grievance? In the same way, by reference to Section 1.1, because the international also is the bargaining agent on behalf of its members and is a signatory, and Judge Russo, in her recommendation, cited several provisions that even if you were to ignore the fact that the international is the bargaining agent on behalf of the individual employees, there are instances where non-signatories could enforce the agreement on behalf of the represented parties. But I don't think you need to reach that non-signatory issue here because the ILWU, the international, is, in fact, a signatory, and so the grievance process acts on behalf of those workers with both unions, the local and the international, acting as the bargaining agent. I'd also like to address your question, Judge Okuda, that you counts fled in this case. Each and every one of them affirmatively pleads as the damage element, overbilling or overpayment. Count one, paragraph 24, talks about a legally inflated income reverted to ILWU. That's the harm alleged. Count two, paragraph 28, employees' inflated income became the union's inflated dues. Count three, paragraph 38. Count four, paragraph 46. Count five, paragraph 54. Count six, paragraph 63. Count seven, paragraph 66. Each and every one of those elements specifically alleges overpayment, overbilling, excess wages, and you're absolutely right, your honor, that there is no way, literally no way, to determine whether employees were paid for more than they were entitled to be paid without interpretation and deep examination of the collective bargaining agreement. Judge Graber, you referenced several of the provisions. We've got, in this case, these are workers whose compensation is determined by a mix of provisions. They're entitled to premium pay. They're entitled to show-up pay, reporting guarantees, sometimes four hours, sometimes eight hours, depending on the particular circumstances. They're entitled to vacation pay, holiday pay. They don't need to show up on a vacation. They are entitled, in certain circumstances, to standby and waiting pay, section 13 of the collective bargaining agreement. So there's an entire mix. Also, under long-standing past practice, this has been known to this industry that workers arrange their own break times, that they're not necessarily physically present off the ship's side throughout the course of their shift. Are they allowed to submit timesheets that show that they worked hours when they didn't work, or was that an unusual practice? I can understand that you might be paid for hours that you didn't work, but I didn't see anything in the CBA indicating that you could claim that you worked hours that you didn't work on your timesheets. Is there something to that effect? I think the closest thing in the record that addresses that is the Williams Declaration, which talks about this being a long-standing practice. So yes, the employer was aware that workers would split shifts, would record their time for the entire shift, and it'd be no different, for example, for a salaried worker indicating that they quote-unquote worked Monday through Friday, but physically only appeared in the office on Monday. And there's nothing fraudulent about that if that is the accepted understanding and the practice of that employment. You can also imagine these rate workers who are asked for whatever reason to record time in a certain way, but are actually only paid by virtue of the number of shipments they load or compensation practices are quite complex. They're spelled out in detail in the collective bargaining agreement and hovered from this circuit, which is good law. It's controlling law determined in a mirror image case that a RICO claim was preempted. The Seventh Circuit and Tenth Circuits had both followed suit in Underwood in the Seventh Circuit and in Frye against Alpa in the Tenth Circuit, and CET points to no authority, literally no authority, to the contrary, finding that where there has been a RICO claim, it alleges overpayment or underpayment of wages or benefits provided by a collective bargaining agreement, that it is not subject to arbitration by 301. And that's because that is the clearly correct analysis. It's consistent with Curtis. It's consistent with literally decades of 301 jurisprudence from this court and courts throughout the nation. And so respectfully, I don't think it's a close question in this case. I think it's one that this circuit has opined on and we have a controlling decision. CET does attempt to say that under the RLA, there's contractual remedy, that the arbitrators are limited to contractual remedies. Neither point a meaningful distinction. The Supreme Court told us in Lingle, and this court has recognized multiple times for determining preemption under 301 versus under RLA is virtually indistinguishable. There's only one meaningful distinction and that's complete versus ordinary preemption, not relevant here. So in terms of the questions asked, the substance of the test, it works exactly the same way. As for the contractual limitations on an arbitrator's authority, that's absolutely no different in the 301 context than it would be in the RLA context. And in fact, Hubbard was an airline case, not a rail case. So there was a system board instead of the NRAB and it's entirely a creature of contract, just like it is here in 301. So we see no difference at all between Hubbard and this case. And we think Hubbard is absolutely controlling authority. Unless your honors have further questions on the correct application of 301, I'd like to address some of the objections that CET makes on appeal. Their first and most forceful argument or the argument that they offer most forcefully is that the lower court applied the wrong test. And again, we pointed to three circuit court decisions, including the controlling decision of this court indicating that no, where there is a RICO claim that itself either directly depends on contractual rights or requires CBA interpretation, that the same test that we're familiar with as applied to state laws applies to those federal statutory claims. And we've also cited literally scores of literally, but several, several cases. The court, the en banc court said you get your state law claim. The only thing that we refer to arbitration are any elements that require interpretation of the CBA. And that would be the case with RICO as well. Why wouldn't it be? It would be your honor. And the proper disposition is to dismiss without prejudice, which is what Judge Simon did here. And so if CET wishes to pursue arbitration after that dismissal, it can attempt to arbitrate the case. We'll have whatever contractual defenses we have in that arbitration. Some of them may be timeliness, some of them may be on the merits, but it will go through the arbitration process. And if at the end of that arbitration, there is an award that states, that confirms CET's position that says, yep, our time sheets were fraudulent and yes, those overpayments indicate something that CET was entitled to, then it may be possible at that point in time for CET to return to court to say, we're now in a position to plead the other RICO elements, the invested income, the control via inflated dues, all of which we've briefed below. And we think we have other good legal defenses too, but it could come back to court at that point in time and present those issues. But under 301 Shirky also said that a state law claim, even though it made specific reference to the CBA in that case could be pursued independently in state court. And the fact that it referenced the CBA and the terms of the CBA was not relevant for controlling because there wasn't a dispute about the interpretation. You could just look at the contract and see how much over time the employee was entitled to. As I understand opposing counsel, he's arguing that here, there's no dispute about the interpretation of the CBA. You may need to look at it to see how much payment the workers were entitled to, but there's no, as in Shirky, there's no reason why the RICO claim couldn't go proceed separately. What's your response to that? He's wrong, respectfully. The CET points to 14.1, the stay on shift provision as a provision that they believe they can rely on as saying that any minute that our workers spent claiming pay for where they were not physically present on the shift is fraud and overpayment. Now we've pointed, as we've discussed earlier today, to numerous provisions, guaranteed pay, the replacement pay, the show-up pay, the standby and waiting time pay, the vacation, etc., which do and not to mention those are all inside the collective bargaining agreement. There's also past practice, which of course 301 incorporates industrial law of the shop and builds that into the collective bargaining agreement. That's this court's decision in Matson, among many others. So it's different from Shirky in that way. In this case, there is a hot and active dispute between the parties about what the collective bargaining agreement means and how it should apply to the two patterns that CET has alleged, the split shifts and the no-shows, and the parties hotly dispute the meaning and application of that. And so applying the same governing framework articulated in Shirky, but to a case that has very different facts, in that case the flight attendant union conceded an oral argument that the airline's position was correct. There's been no such concession here. In fact, throughout the briefing, we strenuously argued contrary that the collective bargaining agreement does entitle our workers to a proper payment for each of those claims. So my time is running down. Unless your honors have further questions, we ask you to affirm the dismissal. Thank you. Thank you, counsel. Mr. McCracken, you have a little bit of rebuttal time remaining. Thank you, your honor. It's well settled that merely because a court needs to refer to or apply or consult a collective bargaining agreement or because a defendant raises the collective bargaining as a defense, that does not mean that a claim is precluded. Is there a dispute about, opposing counsel says there's an active dispute about the meaning and application of the CDA. I didn't see that in your briefs, but is that correct or not? There's language in Shirky that applies an active dispute standard, but that also goes on to recite the principles. But in your case, is there an active dispute about the meaning and application of the CDA? No, no, your honor, because we believe they need to show that there's some ambiguity in the agreement that requires interpretation and they have yet. But counsel, your colleague has just done that by saying that the provision you cite has to be read along with a laundry list of other provisions and along with past practice between the parties and the facts of each individual employee to determine which of you is right about overpayment or no overpayment. So why isn't that an active dispute and an ambiguity about how to apply this agreement to someone who isn't physically on the job? We still have no explanation of any, and they have not tried at all to explain what part of the collective bargaining agreement would allow a no show for eight hours or the split shift complaint that we have. Well, yes, but among other things, counsel has referred to the practice between the parties, and that is a typical thing that comes up in labor arbitrations and is a permissible ground for interpreting a collective bargaining agreement that's silent or ambiguous. I guess I don't understand how you can say it's not ambiguous given what opposing counsel has just argued. They have not pointed to an ambiguity and with respect to past practices, this agreement expressly excludes evidence of past practices for interpretation of the agreement. Any prior local agreements are canceled or superseded. Past customary practices have force or effect in the interpretation of this agreement according to the integration clause in the CBA. The Williams Declaration, which they submitted to discuss past practices, again, talks about past practices, talks about industry standards, but does not explain where in the agreement that the defendants can claim eight hours when they don't show up for work or where in the agreement they can claim the split shift complaint that we assert in our briefing. Thank you, counsel. We appreciate the arguments from both of you. They've been very helpful in this interesting case, and the case just argued is now submitted.
judges: Graber, Clifton, Ikuta